IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES D.,[1]

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 3:21-CV-1154-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Charles D. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is reversed and remanded for rehearing and reconsideration of the evidence.

## PROCEDURAL HISTORY

Plaintiff applied for Supplemental Security Income ("SSI") and DIB on March 5, 2019, initially claiming a disability date of March 15, 2012. (Tr. 156.) Plaintiff later amended the alleged onset date to December 1, 2017. (Tr. 34.) The application initially was denied on October 11, 2019 (Tr. 68); it was denied upon reconsideration on February 7, 2020 (Tr. 89). Plaintiff timely requested a hearing, and a hearing was held before Administrative Law Judge Stacey Foster ("ALJ") on October 7, 2020. (Tr. 30-50.)

On January 11, 2021, the ALJ issued a decision awarding SSI benefits as of March 5,

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

2019, but denying DIB from the alleged onset date of December 1, 2017. (Tr. 12-29.) The decision was affirmed by the Appeals Council on July 23, 2021. (Tr. 1-6.)

Plaintiff now appeals the denial of DIB directly to this Court. Plaintiff raises four points: (1) whether the ALJ's residual functional capacity ("RFC") determination that he could work at all exertional levels for the period prior to December 31, 2017, his date last insured, is supported by medical evidence; (2) whether the ALJ properly discounted the lack of insurance and continued smoking for the period of 2012 through December 31, 2017; (3) whether substantial evidence supports the conclusions that Plaintiff had transferability of skills at any relevant period; and (4) whether the jobs identified by the vocational expert allow Plaintiff to avoid nonexertional limitations. (Doc. 18). The Commissioner timely filed a brief in opposition. (Doc. 20).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's

determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence and requires the court to remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

## Discussion

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth five questions for the ALJ to consider in assessing whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment

meet or equal any impairment enumerated in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him unable to perform his past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**I.      Relevant Medical Records**

On April 21, 2011, Plaintiff presented to his primary care physician's office for numbness in his left arm and leg, as well as elevated blood pressure, shortness of breath, and lack of energy. (Tr. 401.) Plaintiff was seen by ANP Brookshier, who ordered a pulmonary function test and a chest x-ray. (Tr. 403.) A week later, Plaintiff returned to ANP Brookshier complaining of being very congested and short of breath. (Tr. 400.) He was also coughing, which was keeping him from sleeping. (*Id.*) ANP Brookshier prescribed an albuterol inhaler. (Tr. 401.)

The chest x-ray, performed on April 28, 2011, showed destructive emphysematous changes in both lungs, which were severe in the upper lobes, as well as evidence of early chronic interstitial lung fibrosis. (Tr. 410-11.) The pulmonary function test showed moderate obstructive ventilatory defect, with some improvement after using a bronchodilator. (Tr. 419.) Specifically, his post-bronchodilator forced vital capacity (FVC) was 111 percent of expected values and his forced expiratory volume, one second (FEV-1) was 81 percent of the expected value. (*Id.*)

On May 5, 2011, Plaintiff saw his primary care physician, Dr. Randy Oliver, for a follow-up visit. Dr. Oliver's notes referred to a 2007 chest x-ray, which showed "mod severe emphysema/interstitial fibrosis" and was "already showing COPD." (Tr. 398.) Dr. Oliver noted Plaintiff was "easily" short of breath and advised Plaintiff to quit smoking as the "damage is done . . . maybe progressive as is . . . and certainly will be bad if he keeps smoking." (Tr. 398-99.) Dr. Oliver prescribed Plaintiff Chantix, Spiriva, and Advair, and he recommended that Plaintiff have a PET scan. (*Id.*) A CT scan of Plaintiff's chest on May 10, 2011, again showed moderate to severe emphysematous changes throughout the upper to mid lungs. (Tr. 431.)

Plaintiff next saw Dr. Oliver on August 22, 2011, complaining of shortness of breath. (Tr. 393.) Dr. Oliver refilled Plaintiff's prescriptions, added prednisone, and diagnosed him with COPD (chronic obstructive pulmonary disease) and dyspnea (shortness of breath). (Tr. 397.)

Plaintiff's last visit with Dr. Oliver in 2011 occurred on October 28. (Tr. 392.) Plaintiff complained of head and chest congestion. (Tr. 393.) Dr. Oliver diagnosed Plaintiff with COPD with exacerbation and prescribed prednisone and an antibiotic. (*Id.*)

Plaintiff has no further documented medical care until April 9, 2019, when he returned to Dr. Oliver. (Tr. 345.) Dr. Oliver noted that Plaintiff had a significant cough with wheeze and that his cough issues were "now worse than ever. He is easily short of breath." (*Id.*) With regard to shortness of breath, Dr. Oliver stated: "acute-chronic. Has multiple possibilities including COPD, cardiac renal anemia and others. Has been tolerated for a certain extent for sounds like quite a while." (*Id.*)

Plaintiff returned to Dr. Oliver on April 23, 2019. His shortness of breath was noted to be chronic/variable, though improved now that he was taking medication for "what appears to be a rather significant case of COPD." (Tr. 349.) Dr. Oliver also noted that Plaintiff reported decreasing his amount of smoking and being interested in nicotine patches. (*Id.*) A CT scan of Plaintiff's chest was ordered. (*Id.*). That CT scan, performed on May 10, 2019, showed moderate to severe emphysematous changes throughout the upper to mid lungs and acute chronic bronchiolitis with multiple mucus plugs within the right lower lobe. (Tr. 381-82.) Plaintiff also underwent another pulmonary function test, which indicated a post-bronchodilator FVC value of 76 percent and a FEV-1 value of 62 percent of expected values.

On September 12, 2019, Dr. Oliver noted that Plaintiff's shortness of breath was related to COPD and was chronic, but that medications were helping. (Tr. 356.) He further stated that Plaintiff "does have a significant amount of emphysema and is unfortunate that he keeps smoking and is likely to get worse." (Tr. 361.)

Plaintiff had a heart attack in April 2020. (Tr. 35.) Plaintiff last saw Dr. Oliver on June 16, 2020, with concerns that he had sleep apnea. At that time, Plaintiff smoked one-fourth of a pack of cigarettes a day. (Tr. 635.) Dr. Oliver ordered another CT scan of Plaintiff's lungs, which showed moderate emphysema, greatest in the upper lobes. (Tr. 653). A sleep study on

September 22, 2020, confirmed obstructive sleep apnea. (Tr. 775-76.)

## II.     State Agency Examiners

Dr. Adrian Feinerman examined Plaintiff on May 29, 2019, as a consultative examiner for the Bureau of Disability Determination Services. (Tr. 480.) Dr. Feinerman found Plaintiff's lungs to be clear with no wheezes. He concluded that Plaintiff is able to sit, stand, walk, hear, speak, lift, carry, handle objects, and handle funds on his own behalf, despite his complaints of shortness of breath due to COPD. (Tr. 482.)

At the initial disability evaluation level, Dr. Richard Smith found there was insufficient evidence to evaluate the claim for the period through the date last insured. He also opined that Plaintiff could perform work at all exertional levels except that he should avoid concentrated exposure to pulmonary irritants. (Tr. 57-58.) On reconsideration, Dr. James Hinchen made the same findings. (Tr. 85-86.)

## III.    Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing on October 7, 2020. (Tr. 30-50.) Vocational expert Anne Darnell also testified by telephone. (*Id.*)

Plaintiff has a high school education, served in the Marine Corps, and worked for 25 years in a cement plant. (Tr. 34.) As part of his job, Plaintiff initially lifted up to 100 pounds, but toward the end he lifted about 50 pounds or less. (Tr. 37.) In 2012, Plaintiff's employer closed half of the cement plant, and he was told he no longer had a job. (Tr. 38.) Plaintiff received an early retirement pension. (*Id.*) After he lost his job, Plaintiff tried three or four different jobs, but he could no longer lift or do as much manual work as he could when he was younger due to his breathing issues. (Tr. 39.)

After Plaintiff lost his job, he testified, he no longer could afford to keep health

insurance. (*Id.*). As Plaintiff became less active, his breathing issues became worse. And as his breathing issues became worse, he became less active. (*Id.*). Plaintiff could no longer be outside in the summer humidity. (Tr. 40.)

Plaintiff tried to pay for his health care out of pocket, but his high blood pressure medicine and inhalers were $600 a month. (*Id.*) Plaintiff started buying breathing treatments and inhalers over the counter, and even used his family members' extra prescription inhalers. (Tr. 40-41.) Plaintiff testified that he did not apply for disability sooner because he didn't know how disability worked, and he had always been told that the longer you wait to apply for Social Security, the more money you get. (Tr. 41.) So, he tried to get by on his small pension and his savings. (*Id.*)

Prior to 2019, Plaintiff had trouble doing basic chores because of his breathing. (Tr. 42.) He could no longer mow or vacuum. (*Id.*) He had to stay in air conditioning in the summer, otherwise he would get dizzy or feel faint. (*Id.*) Plaintiff could do an outdoor activity for about five minutes, then would need to come back inside to catch his breath for 20 to 30 minutes. (*Id.*) If indoors, Plaintiff could do an activity for 10 to 15 minutes before needing to sit down and rest for another 15 to 20 minutes. (Tr. 42-43.) Plaintiff also had issues with walking because his legs would swell, he presumed from his high blood pressure. (Tr. 43.) Finally, Plaintiff reported difficulty sleeping due to his lung condition, as it causes him to wake up trying to catch his breath. (Tr. 45-46.) He keeps the head of his bed raised about six inches to help with his breathing as well as acid reflux. (Tr. 46.)

Plaintiff recounted his efforts to stop smoking over the years. (Tr. 44.) In 2011, he took Chantix and was able to quit smoking for a while. (*Id.*) Eventually, however, his addiction got the best of him and he wound up smoking again. (*Id.*) In 2019, Plaintiff tried a nicotine

patch and quit smoking for two or three months, but, again, his addiction led him back to smoking three or four cigarettes a day. (*Id.*)

The vocational expert classified Plaintiff's past work as an industrial maintenance mechanic. (Tr. 47.) She testified that an individual of Plaintiff's age, education, and work history, who could tolerate physical exertion at all levels but must avoid concentrated exposure to extreme heat, humidity, and pulmonary irritants, could not perform Plaintiff's past work. (Tr. 47-48.) That person could perform other jobs, however, including a laborer in stores, a hand packager, or a patient transport. (Tr. 48.) If the person required rest periods after two hours of exertion, outside of the normal 15-minute breaks and lunch break, exceeding 10 percent of the workday, then those jobs would be precluded. (Tr. 49.) When adding the limitation that the person could work at only light exertional levels, the vocational expert testified that person could perform mail clerk, warehouse checker, or hand bander. (Tr. 48).

### DECISION OF THE ALJ

In reaching her decision, the ALJ considered hearing testimony from Plaintiff and the impartial vocational expert, as well as Plaintiff's medical records from Dr. Oliver, the examination by Dr. Feinerman, and the State agency medical consultants' opinions.

At step one, the ALJ concluded Plaintiff has not engaged in substantial gainful activity since December 1, 2017. (Tr. 19).

At step two, the ALJ concluded that Plaintiff has the following severe impairments: COPD, obesity, pulmonary fibrosis, coronary artery disease, and hypertension. (*Id.*) These impairments significantly limit Plaintiff's ability to perform basic work activities. (*Id.*)

At step three, the ALJ found Plaintiff does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the impairments listed in the regulations. (*Id.*)

At step four, the ALJ determined that since December 1, 2017, Plaintiff has been unable to perform past relevant work. The ALJ determined that, through December 31, 2017, the date last insured, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he should have avoided concentrated exposure to extreme heat, humidity, and pulmonary irritants. (*Id.*) The ALJ noted that when Plaintiff filed his application for DIB, he alleged he was unable to work due to pulmonary fibrosis, COPD, asthma, and high blood pressure. (Tr. 20.) He stated that he stopped working in March 2012 due to a workforce reduction, but that his pulmonary fibrosis made it difficult for him to return to work anywhere else. (*Id.*) The ALJ considered Plaintiff's hearing testimony, in which Plaintiff stated that his lung condition worsened over time, and that, prior to 2017, he was unable to be outside in the humidity or do chores such as mowing or vacuuming. Nevertheless, the ALJ concluded that while "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported for the period through December 31, 2017, his date last insured." (*Id.*)

The ALJ considered Plaintiff's medical records from 2011, which showed moderate obstructive ventilatory defect as well as moderately severe destructive emphysematous changes in both upper lobes with evidence of early chronic interstitial lung fibrosis. (*Id.*) There also was evidence of coronary artery calcification. (*Id.*) After 2011, there was no evidence of any additional treatment until April 2019. (Tr. 21.) Although the ALJ considered

Plaintiff's testimony that his lack of treatment was due to not having health insurance, the ALJ found that the longitudinal evidence "fails to support limitations beyond those established in the above residual functional capacity." (*Id.*) The ALJ found that Plaintiff continued smoking, which indicated he had some discretionary money. (*Id.*) Furthermore, while the evidence supported his allegations about difficulty breathing in heat and humidity, there was "nothing suggesting he had any exertional limitations through December 31, 2017." (*Id.*) Thus, the ALJ concluded at step five that, through December 31, 2017, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. Accordingly, through the date last insured, a finding of "not disabled" was appropriate, and Plaintiff was not entitled to DIB. (Tr. 23.)

Beginning on March 5, 2019, however, the ALJ concluded that Plaintiff had the RFC to perform only light work except that he should avoid concentrated exposure to extreme heat, humidity, and pulmonary irritants. (*Id.*) Light work is defined as lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking (with normal breaks) for a total of about six hours in an eight-hour workday, sitting (with normal breaks) for a total of about six hours in an eight-hour workday, and pushing and/or pulling consistent with lifting and/or carrying. (*Id.*)

In coming to this conclusion, the ALJ considered that in April 2019, Plaintiff reestablished treatment with his primary care provider. (*Id.*) His cough issues were "now worse than ever." (*Id.*) Plaintiff was prescribed medication and referred for testing. (*Id.*) A CT scan of Plaintiff's chest in May 2019 showed moderate to severe emphysematous changes of the lung and mild to moderate atherosclerotic disease. (*Id.*) Plaintiff also underwent a consultative pulmonary function test in May 2019, which showed a worsening in lung

function since the test was performed in 2011. (Tr. 22.) In September 2019, Plaintiff was found to have "significant amount of emphysema." (*Id.*) In April 2020, Plaintiff was hospitalized for chest pain, and an echocardiogram revealed mild to moderate concentric hypertrophy. (*Id.*)

The ALJ reported that, since April 2019, "[t]he diagnostic imaging has shown progression of his lung disease, which is expected since he has continued to smoke. While there is no evidence that he is precluded from all work activity, the evidence does warrant reducing the residual functional capacity to avoid strenuous work activity, such as medium or heavy exertional work." (*Id.*) To that end, the ALJ discounted the opinions of Dr. Feinerman and the State agency medical consultations, who opined that Plaintiff could work at all exertional levels. (*Id.*)

When considering Plaintiff's RFC, age, education, and work experience, the ALJ concluded at step five that, since March 5, 2019, there are no jobs that exist in significant numbers in the national economy that Plaintiff can perform. Thus, the ALJ concluded that Plaintiff became disabled as of March 5, 2019, and is entitled to SSI benefits. (Tr. 23-24).

DISCUSSION

I. **Whether Substantial Evidence Supports the ALJ's Determination and Whether the ALJ Properly Considered Plaintiff's Lack of Insurance and Continued Smoking**

Plaintiff argues that Social Security Ruling ("SSR") 16-3p (S.S.A. Oct. 25, 2017) explains that "[a]n individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to perform work-related activities for an adult [...] unless medical signs or laboratory findings show a medically determinable impairment is present." Here, a CT scan of Plaintiff's chest in May 2011 showed "moderately severe destructive emphysematous changes in both upper lobes with also evidence of early chronic interstitial lung fibrosis." (Tr. 283.) Likewise, in May

2019, a CT scan showed "moderate to severe emphysematous changes of the lung." (Tr. 432.) Plaintiff asserts that a severe, progressive impairment was evident in 2011 and in 2019. Plaintiff was easily short of breath in 2011, and easily short of breath in 2019. (Tr. 336, 445.) Thus, Plaintiff argues, his shortness of breath is substantiated by the medical findings and directly caused by his severe pulmonary impairment, which was diagnosed prior to the date last insured and as far back as 2011. Plaintiff contends that the ALJ has failed to build a logical bridge between the evidence and her conclusion that he had no exertional limits whatsoever prior to December 31, 2017, when advanced diagnostic findings were the same both in 2011 and 2019.

In response, the Commissioner contends that the ALJ reasonably explained why she found that Plaintiff's condition had worsened as of March 5, 2019. The Commissioner argues that Plaintiff's pulmonary function studies in 2019 showed significant worsening compared to his pulmonary function studies from 2011. In 2011, Plaintiff's post-bronchodilator results were 111 percent and 81 percent of the expected values, which were "consistent with a moderate obstructive ventilatory defect." (Tr. 20.) But by 2019, the same pulmonary function test showed post-bronchodilator values of 76 percent and 62 percent of the expected values. (Tr. 22.) The Commissioner also points to the ALJ's explanation that Plaintiff was hospitalized in 2019 for his pulmonary issues and a cardiac catheterization—although the ALJ actually says that Plaintiff was hospitalized in April 2020 due to chest pain, not pulmonary issues. Finally, the Commissioner argues that the ALJ considered that imaging showed Plaintiff had micronodules on his lung in 2019, which were not apparent in 2011—although the micronodules actually were visible on a CT scan performed in July 2020, not 2019. That same CT scan in 2020 showed the presence of moderate emphysema. (Tr. 653.)

The Court agrees with Plaintiff that the ALJ failed to build a logical bridge between the evidence and her conclusion that, through December 31, 2017, Plaintiff could perform a full range of work at all exertional levels as long as he avoids exposure to extreme heat, humidity, and pulmonary irritants. Disregarding Plaintiff's hospitalization in April 2020, which was for heart issues, not pulmonary issues, that leaves only the difference between Plaintiff's scores on his pulmonary function tests between 2011 and 2019 and the presence of micronodules on a CT scan taken in July 2020. Plaintiff's medical records are otherwise remarkably the same from 2011 to 2019. In both 2011 and 2019, Plaintiff's imaging showed moderate to severe emphysematous changes to his lungs, and he consistently reported shortness of breath. While the ALJ notes that Plaintiff was still working in 2011, and did not stop until he lost his job in 2012, Plaintiff testified that his breathing issues made it difficult for him to return to work anywhere else. The ALJ simply failed to provide a logical explanation, other than the lack of objective medical records, as to why she found Plaintiff disabled as of March 5, 2019, but not disabled prior to December 31, 2017, even though Plaintiff was diagnosed in 2011 with a progressive lung disease.

An ALJ cannot rest "a credibility determination too heavily on the absence of objective support" for a claimant's complaints, particularly where the ALJ knows the claimant's lack of insurance prevented him from seeking medical attention and, thus, explains the "lack of objectively quantifiable test results." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Furthermore, an ALJ cannot "'play doctor' by using her own lay opinions to fill evidentiary gaps in the record." *Nicholas G. v. Saul*, No. 17 C 8607, 2019 WL 4059048, at *5 (N.D. Ill. Aug. 28, 2019) (citing *Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003)).

While the ALJ does state that she considered Plaintiff's testimony that "his lack of

treatment was due to not having insurance," the ALJ made no effort to further inquire about any physical limitations Plaintiff had through 2017.

When counsel asked Plaintiff if his breathing issues continued after he became uninsured, Plaintiff explained that his breathing issues became "worse and worse as time went along." (Tr. 40.) He further stated that as far back as 2013, he could no longer do the work that he had the skills to do because he couldn't breathe. (*Id.*) He also could no longer do household chores; even indoors, Plaintiff could only do a task for 10 to 15 minutes at a time before needing to rest. (Tr. 42-43.) The ALJ did not question Plaintiff about his ability to work in 2017, how his breathing issues affected his ability to stand or exert himself in 2017, or any other questions that would give the ALJ insight into Plaintiff's health in 2017.

The ALJ also appears to fault Plaintiff for not seeking medical care despite having no job and testifying he could not afford it. Plaintiff described his attempt to pay for medical care out of pocket, then his attempt to manage his lung disease with over-the-counter medication, then by using family members' inhalers if available. (Tr. 41.) When his attorney asked why he didn't apply for disability sooner, Plaintiff explained that he didn't know how it worked and that he wanted to wait as long as possible to apply for Social Security. (*Id.*) The ALJ discounted Plaintiff's credibility regarding his ability to pay for medical care because, she noted, he had the discretionary income to continue smoking. But, the ALJ did not ask Plaintiff how he afforded cigarettes, if family members bought the cigarettes for him, or how the cost of cigarettes compared to the cost of his prescriptions, which Plaintiff testified was over $600 a month.

In sum, the ALJ's conclusions are not supported by substantial evidence and improperly rely on the lack of objective medical evidence. While the threshold for substantial

evidence "is not high," it still must be "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Saul*, 970 F.3d 818, 821 (7th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). The evidence here is that Plaintiff had moderate to severe emphysema in 2011, perhaps as early as 2007. Between 2011 and 2019, the only recorded change in Plaintiff's condition was a decrease in his pulmonary function after using a bronchodilator and the presence of micronodules, which were noted on a CT scan in 2020. As stated by the ALJ, "[t]he diagnostic imaging has shown progression of his lung disease, which is expected since he has continued to smoke." (Tr. 22.) Nevertheless, the ALJ found him disabled as of March 5, 2019, but not disabled as of December 31, 2017. Such a conclusion is illogical given the evidence in the record. No reasonable mind would find this evidence adequate to support the ALJ's conclusion without further questioning into Plaintiff's condition.

For these reasons, the Court remands this matter to the Commissioner of Social Security for further proceedings consistent with this opinion. Because the Court has found that the ALJ's decision is not supported by substantial evidence, the Court will not determine, at this time, whether Plaintiff had transferability of skills at any relevant period and whether the jobs identified by the vocational expert would have allow Plaintiff to avoid non-exertional limitations.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff and close this case.

**IT IS SO ORDERED.**

**DATED:   March 29, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**